## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| ex rel. Alvin Galuten, Relator, | § | |
| | § | No. 11-4140 |
| vs. | § | |
| | § | |
| UNIVERSITY OF MISSOURI- | § | JURY TRIAL DEMAND |
| COLUMBIA, UNIVERSITY OF | § | |
| MISSOURI-COLUMBIA SCHOOL OF | § | |
| MEDICINE, UNIVERSITY OF | § | **FILED IN CAMERA** |
| MISSOURI-COLUMBIA SCHOOL OF | § | **AND UNDER SEAL** |
| MEDICINE DEPARTMENT OF | § | **PURSUANT TO** |
| RADIOLOGY, MISSOURI RADIOLOGY | § | **31 U.S.C. § 3730** |
| IMAGING CENTER, DR. KENNETH L. | § | |
| RALL, DR. MICHAEL RICHARDS, DR. | § | **DO NOT ENTER INTO PACER** |
| MEGHA GARG, HANS | § | **OR LEXISNEXIS** |
| JUENGERMANN, DR. HUMERA | § | |
| AHSAN, DR. AMIR FALLAHIAN, DR. | § | **DO NOT PLACE IN PRESS BOX** |
| GAURAV KUMAR, AND JOHN DOES 1-  | § | |
| 10, | § | |
| | § | |
| Defendants. | | |

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1.      Relator Alvin Galuten brings this False Claims Act Case against the University of

Missouri Columbia, its Medical School, Department of Radiology, the head of Radiology, Dr.

Kenneth Rall, and the University's imaging center, Missouri Radiology Imaging Center, for (1)

fraudulently claiming reimbursement for radiology services provided by attending or teaching

physicians when those services actually were provided by residents, (2) fraudulently submitting

bills for screening mammograms that were upcoded as diagnostic mammograms, and (3)

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 1 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 1 of 21

fraudulently taking Medicare funds for residents while failing to provide them with the requisite training.

## II.    PARTIES

2.    Relator **Alvin Galuten** is a citizen of the United States and a resident of the States of Tennessee and Florida.  He was a Fellow and part time faculty of Clinical Radiology at the University of Missouri-Columbia School of Medicine, Department of Radiology from about August 1, 2010 until about October 2010.  His primary duties consisted of training in the Department's non-accredited ACGME Mammography Fellowship Program under the direction of Dr. Michael Richards.  Forty percent of his time was to be spent as faculty.  During his time at the DOR, Dr. Galuten developed firsthand knowledge of the facts set forth herein.  Dr. Galuten is thus the original source of the facts and information set forth in this Complaint concerning the activities of University of Missouri Columbia Medical School, its Department of Radiology, Dr. Kenneth Rall, Dr. Michael Richards, Dr. Megha Garg, Hans Juengermann, Dr. Humera Ahsan, Dr. Amir Fallahian, Dr. Gaurav Kumar, and Missouri Radiology Imaging Center.  The facts averred herein are based upon his personal observation and documents in his possession.

3.    Relator has provided to the United States Attorney a full disclosure of substantially all material facts, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2).

4.    The **University of Missouri-Columbia** is a non-profit, public research university located in Columbia, Missouri.  It is the flagship for the University of Missouri system, and one of four campuses that comprise that system.  The University of Missouri-Columbia (MU) receives funding from several sources, including federal and state funds, tuition and fees from students, by charging for certain services, and from gifts, endowments and grants.  The

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 2 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 2 of 21

University is governed by a Board of Curators, who meet at 316 University hall, Columbia, MO 65211.

5.    The **University of Missouri-Columbia School of Medicine** ("SOM") is also a non-profit, public research faculty.  The SOM has a faculty of 70 basic scientists, 260 clinicians, and 350 residents in more than 60 specialties and subspecialties to supervise patient care and student teaching. The school provides postgraduate medical training in virtually all specialties and subspecialties.  It is located at One Hospital Drive, MA204G, DC018.00, Columbia, MO 65212.

6.    The **University of Missouri-Columbia, Department of Radiology** ("DOR") is located at One Hospital Drive, MA204G, DC018.00, Columbia, MO 65212.  The Department is funded not only by federal and state funds, but also charges Medicare, Medicaid, TRICARE, and private insurance companies for the radiology services it provides.  The Department also receives funds for its residents through the Medicare Part A program.

7.    The **Missouri Radiology Imaging Center** ("MRIC") is staffed by physicians from the Department of Radiology, but it is incorporated as a private entity.  Dr. Galuten believes that physicians and staff from the Department of Radiology may be part owners, officers, and/or directors of the Missouri Radiology Imaging Center.  The Missouri Radiology Imaging Center is located at 3302 Broadway Business Park Court, Suite A, Columbia, MO 65203.

8.    **Dr. Kenneth Rall** is the Chairman of the University of Missouri-Columbia, Department of Radiology.  Twenty-five years ago, he left Columbia under a cloud of controversy after being charged with embezzling money from his partners in a radiology practice.  Dr. Rall returned to the School of Medicine in 1998.  His university salary is $560,000/year and he oversees the DOR's budget.  Dr. Kenneth Rall is located at Department of Radiology, DC069.10,

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

University of Missouri Health Care, One Hospital Dr. Columbia, MO 65212. He is sued in his personal capacity.

9. **Dr. Michael Richards** is the head of mammography at the DOR. He is located at Department of Radiology, DC069.10, University of Missouri Health Care, One Hospital Dr. Columbia, MO 65212. He is sued in his personal capacity.

10. **Dr. Megha Garg** is an attending physician in mammography and MSK Radiology at the DOR. She is located at Department of Radiology, DC069.10, University of Missouri Health Care, One Hospital Dr. Columbia, MO 65212. She is sued in her personal capacity.

11. **Hans Juengermann** is the ROM's Department Administrator. He is located at Department of Radiology, DC069.10, University of Missouri Health Care, One Hospital Dr. Columbia, MO 65212. He is sued in his personal capacity.

12. **Dr. Humera Ahsan** is a visiting professor in the ROM. She is located at Department of Radiology, DC069.10, University of Missouri Health Care, One Hospital Dr. Columbia, MO 65212. She is sued in her personal capacity.

13. **Dr. Amir Fallahian** is a visiting professor in the ROM. He is located at Department of Radiology, DC069.10, University of Missouri Health Care, One Hospital Dr. Columbia, MO 65212. He is sued in his personal capacity.

14. **Dr. Gaurav Kumar** is a visiting professor in the ROM. He is located at Department of Radiology, DC069.10, University of Missouri Health Care, One Hospital Dr. Columbia, MO 65212. He is sued in his personal capacity.

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 4 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 4 of 21

### III.    JURISDICTION AND VENUE

15.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*  This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

16.     The Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because the defendants can be found in and transact the business that is the subject matter of this lawsuit in the Western District of Missouri.

17.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the University of Missouri Columbia resides in this district.

### IV.    FACTS

#### A.  Federal Health Programs

18.     Medicare is a federally-funded health insurance program primarily benefitting the elderly.   Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.   Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of physician's services, including services provided to patients who are hospitalized, if the services are medically necessary and directly and personally provided by the physician.

19.     Residents in Accreditation Council for Graduate Medical Education-accredited programs are partially supported by the Medicare program through Medicare Part A payments to their institutions.  Because the federal government views this financial support as payment for the

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 5 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 5 of 21

residents' services to Medicare beneficiaries, a resident in an accredited program cannot bill Medicare Part B for any procedure or other service that he or she may provide as part of the residency.

20.    Pursuant to 42 C.F.R. 415.170, pay for physician services provided in teaching settings is generally only allowed if services are personally furnished by a physician who is not a resident or a teaching physician was physically present during the critical or key portions of the service that a resident performs, subject to a few specific exceptions.  *See also* Department of Health and Human Services, Centers for Medicare & Medicaid Services, Medicare Carriers Manual, Part 3 – Claims Process, Transmittal 1780, Sections 15016-15018 (Nov. 22, 2002).

21.    For radiology procedures, Medicare will pay for the interpretation of diagnostic radiology and other diagnostic tests only if the interpretation is performed by or reviewed with a teaching physician.  *Id.*  If the teaching physician's signature is the only signature on the interpretation, Medicare assumes that he or she is indicating that he or she personally performed the interpretation.  If a resident prepares and signs the interpretation, the teaching physician must indicate that he or she has personally reviewed the image and the resident's interpretation and either agrees with it or edits the findings.  Medicare *does not pay for an interpretation if the teaching physician only countersigns the resident's interpretation.  Id.*

22.    Payments to Graduate Medical Education-accredited programs by Medicare are called Direct Graduate Medical Education (DGME) payments.    Pursuant to 42 C.F.R. 412.105, Medicare generally pays each teaching hospital a portion of the hospital's "per resident amount," which represents the DGME costs incurred by a teaching hospital in a base period divided by the number of full-time equivalent residents during that base year.  Medicare pays its portion of the

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 6 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 6 of 21

PRA based on the ratio of the number of total inpatient days Medicare patients spend in the hospital divided by the hospital's total inpatient days for all patients. In order for a graduate medical education-accredited program to receive payment for a full-time equivalent resident, the resident must be enrolled in an approved teaching program. 42 C.F.R. 412.105(f). An approved teaching program must meet one of the following requirements: (1) it must be approved by the Accreditation Council for Graduate Medical Education, by the American Osteopathic Association, by the Commission on Dental Accreditation of the American Dental Association, or by the Council on Podiatric Medical Education of the American Podiatric Medical Association, *id.*; 42 C.F.R. 415.152, (2) it may count towards certification of the participant in a specialty or subspecialty listed in the current edition of one of several publications, (3) it is approved by the Accreditation Council for Graduate Medical Education as a fellowship program in geriatric medicine; or (4) it is a program that would be accredited except for the accrediting agency's reliance upon an accreditation standard that requires an entity to perform an induced abortion. *Id.* In addition, in order for the graduate medical-education-accredited program to receive Medicare funds for a resident, the resident must be involved in patient care. *Id.*

## B. The University of Missouri's Radiology Department

23. The University of Missouri's radiology department provides radiology services to numerous hospitals in the University's network, as well as at the Missouri Radiology Imaging Center and various clinics, such as the Missouri Orthopedic Institute. All of the hospitals in the University of Missouri's system are teaching hospitals. The radiology department is headed by Dr. Kenneth Rall. All diagnostic mammogram are done at the Ellis Fischel Cancer Center. Screening mammograms are done at Ellis Fischel, Women's and Children's Hospital, and in

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 7 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 7 of 21

mobile vans. Dr. Michael Richards is the head of mammography at Ellis Fischel and also oversees the radiology section at Ellis Fischel. Other radiology services, such as CT scans and ultrasounds are also provided at Ellis Fischel. Pediatric radiology services are provided at the Women's and Children's Hospital.

24. The Diagnostic Radiology residency program at the University of Missouri offers graduate training in all areas of diagnostic radiology, including neuroradiology, interventional radiology, CT, ultrasonography, nuclear medicine, and MRI, as well as bone, chest, GI/GU, mammography, and pediatrics imaging. The primary clinical institution is University of Missouri Health Care, but residents also rotate through Ellis Fischel Cancer Center and Harry S. Truman Memorial Veterans' hospital. The residents training in mammography are supervised by Dr. Richards; Dr. Megha Garg also serves as an attending physician in mammography, supervising the residents in this area. The pediatric radiology residents train at the Women's and Children's Hospital.

25. In addition, the physicians on staff in the University's radiology department and residents provide radiology services at the privately owned Missouri Radiology Imaging Center, which provides CT scans, X-rays, MRIs, and ultrasound. Dr. Garg and Dr. Deepak Raghu of the Department also provide services at the Missouri Orthopedics Institute, which does CT scans, X-rays, MRIs, and ultrasound.

26. When Dr. Galuten arrived as a fellow at the DOR, he found a program in which residents received minimal instruction, but did the vast majority of the work. The entire program was driven by a desire to review the most charts in the least amount of time, in order to maximize billing. This meant, as set forth in greater detail below, that the residents and foreign-trained

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 8 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 8 of 21

doctors did most of the reviews with little or no supervision, and attending and teaching physicians often did not then review the residents' reads. For example, residents would work in twelve-hour shifts two days in a row. Dr. Galuten was aware that residents would often spend an entire two-days without ever seeing an attending physician. More often than not, the attending physician; the attending physicians' "overreads" were almost always done in a separate room without providing any feedback to the resident. The head of the department, Dr. Rall, rarely if ever did a read in front of the residents, not only violating Medicare guidelines, but also failing to provide instruction to the residents. Dr. Rall also approved of having a resident do Dr. Richards' night call (5 P.M. until about 10 P.M.), meaning there was a time during the week when the residents were supervised only by another resident. Although the DOR insisted that faculty ought to provide "constant, informative, and constructive feedback" to the fellows and residents during readout sessions when fellows' and residents' interpretations were being reviewed, such feedback and instruction was almost never provided. Dr. Galuten is aware that the DOR often represented in billing that he participated at certain procedures in which he did not in fact participate. This happened often: residents were not included in certain procedures or allowed to participate, and therefore were precluded from learning important techniques that they ought to have learned as part of their residency.

27. Reports and mammograms were also often read without following even basic methodology for properly reading reports. For example, film screen mammograms were done without using a hot light or magnifying glass. And many reports were read without consulting the patient's prior reports or previous mammograms. In short, the DOR does whatever possible to make the most money while doing shoddy quality work, leading to concerns that patients may

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 9 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 9 of 21

have been misdiagnosed or at the worst, that cancers and other problems were missed.  In fact, Dr. Galuten, who insisted on doing thorough reviews, picked up several breast and lung cancers that had been missed.  Dr. Galuten also saw reports indicating that Dr. Rall had missed a lung cancer on a CT scan, indicating that Rall likely did not review the image.

### C. Defendants Billed for Services Provided by Residents Without Proper Supervision by a Licensed Physician

28.     More specifically, while Dr. Galuten was serving as a fellow in the mammography department, he came to realize that the Department was billing for unsupervised radiology services provided by residents.  As set forth above, Medicare will pay for the interpretation of diagnostic radiology and other diagnostic tests only if the interpretation is performed by or reviewed with a teaching physician.  *Id.*  But at DOR, the teaching physicians were not reviewing reports done by residents and were not reviewing the images associated with those reports.

29.     Specifically, there were policies in place at DOR that rewarded high volume chart reviews.  For example, physicians at the DOR were paid bonuses based on their productivity.  As Dr. Galuten's employment contract put it, "[a]dditional faculty compensation would be paid through the department incentive plan, depending on your clinical productivity and other contributions towards the growth of the department."  In the DOR, "clinical productivity" was measured by a metric called "relative value units."  The proprietary formula for bonuses based on these "relative value units" included the number of charts reviewed in a certain amount of time.  Thus, the more charts a physician reviewed, the higher his bonus.  This policy encouraged physicians to merely "rubber-stamp" or countersign reports without properly reviewing them.  DOR put such policies in place in deliberate ignorance of the fact that they would encourage fraudulent review practices or with reckless disregard for the fact that they would encourage such

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

practices.

30.     While working as a fellow, Dr. Galuten heard Dr. Kenneth Rall brag that he reviewed 60,000 charts per year.   In Dr. Galuten's estimation, on average, if a radiologist thoroughly reviews a chart, meaning he looks at the image, looks at prior images, and reads the report, he will be able to review between 12,000-15,000 charts per year.    To put it differently, if Dr. Rall reviewed charts 24 hours a day, 365 days a year, he would have approximately 525,948 minutes a year to review charts.  At 60,000 charts a year, he would have about 8.7 minutes a chart.  More realistically, if Dr. Rall worked 8 hours a day, 6 days a week, for 50 of the 52 weeks of the year, he would have 144,000 minutes to review charts.  At 60,000 charts a year, it would mean he would have spent only 2.4 minutes reviewing each chart.   Based on his experience as a radiologist, Dr. Galuten believes that one cannot fully review an image and report properly in 2.4 minutes.

31.     Additionally, Dr. Galuten is aware that over one holiday weekend in 2010, Dr. Rall "reviewed" 150 cases done by residents in under 20 minutes.  This is physically impossible.  In fact, Dr. Galuten believes that Dr. Rall merely rubber-stamped or counter-signed those cases, without adequately looking at the images or reading the residents' reports.

32.     Dr. Rall constantly told Dr. Galuten and other physicians in the DOR, "Don't waste your time looking at the images—just sign the report!"  He often used an expletive when urging the attending physicians to get through reports in this manner.  He also told Dr. Galuten, "You're too anal—don't waste your time teaching those kids, just sign the reports."

33.     Dr. Richards reviewed the charts that Dr. Galuten reviewed as a fellow.  Indeed, Dr. Galuten's employment contract made clear that during his fellowship, "all cases must be signed-

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

off by an attending physician." Dr. Galuten is aware of situations in which Dr. Richards reviewed many of Dr Galuten's charts in a few minutes, leading him to believe that Dr. Richards did not review the images or read Dr. Galuten's reports, but merely rubber-stamped, countersigned, or "batch" signed the charts without proper review.

34.     In addition, Dr. Galuten is aware that Dr. Richards, as a policy matter, did not review certain images. In mammography, each read is assigned a number from zero to five that indicates the severity of the diagnosis. A "zero" means that the image needs to be redone; a "1" or "2" indicates that there is essentially no abnormality. Anything "3" or higher indicates an abnormality, with a "5" obviously being the most serious. Dr. Galuten is aware that Dr. Richards only reviewed images on reports that the residents had assigned a zero, or three or higher. He did not review images for cases assigned a "1" or "2."

35.     All radiology "charts" are contained electronically at the DOR. When a physician logs into the computer system, he will have a batch of charts waiting in a folder on the computer that have been reviewed by residents that the physician is supposed review and then sign off on. In the computer system, the reports can be reviewed and signed individually, or can be signed in "batches." Additionally, the reports are saved separately from the images, so the images need to be opened separately from the reports for review. Dr. Galuten believes that Dr. Rall and other physicians in the radiology department batch-signed charts without separately opening and reviewing the images or even reading the residents' reports.

36.     Dr. Galuten is also aware of situations in which Dr. Rall gave residents his password so that they could sign in under his name and sign off on reports, particularly when Dr. Rall was out on vacation or otherwise not at work. Schedules from the time period when Dr. Galuten was

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 12 of 21

a fellow at the DOR show that there were weeks when residents were designated to act as attending physicians, without any actual attending physician being there.

37.     In addition, the DOR makes extra money by doing teleradiology reads of bone films. The DOR pays residents per read for this work, in addition to their salaries.  Due to a backlog in these reads, Dr. Rall and Hans Juengermann, the DOR's business manager, suggested to the residents that they do these reads after hours and then "dump" them into Dr. Rall's queue, so that he could "sign off" on them the next morning.  Dr. Rall does not actually read and review these exams.  He merely signs off on them so that they can be processed and billed.

38.     When signing off on a chart prepared by a resident, the physician would electronically sign the report which explicitly certified, "I have personally reviewed the images and agree with the final interpretation."  Teaching physicians at the DOR checked this box, certifying that they had personally reviewed the images and agreed with the resident's interpretation, when in fact they did not review the images.  The DOR billed Medicare for radiology services for which false certifications such as this were made.

39.     Because Dr. Galuten was only privy to the fraudulent conduct, but not the billing, he cannot identify the specific fraudulent bills defendants submitted to the United States. Defendants have within their exclusive possession and control documents, including e-files, that will further support Dr. Galuten's claims and show specific damages. These documents include, but are not limited to, bills, invoices, and forms submitted to Medicare and Medicaid for payment for radiology services and reports from the DOR's computer system that will show how many reports were signed by each teaching physician at the DOR by day for the relevant time period.

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 13 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 13 of 21

**D. Defendants Billed for Services Provided by Physicians with Temporary Licenses Without Proper Supervision**

40.     The DOR employs three foreign physicians—Dr. Humera Ahsan, Dr. Amir Fallahian, and Dr. Gaurav Kumar—who are provided licenses to practice in Missouri through a "visiting professor license" or a "temporary license."  A visiting professor license is a license granted to "any qualified physician to teach or lecture at an accredited medical school or hospital in the State of Missouri."  *See* http://www.msma.org/mx/hm.asp?id=LicensureRegistration (last viewed April 13, 2011).  A "temporary license" may be issued to "an applicant in a Board-approved hospital training program, practicing under the supervision of the superintendent or chief of staff of such institution."

41.     The three foreign physicians with visiting professor licenses were engaged in radiology procedures and reviewed radiology charts without the supervision of the chief of the DOR, Dr. Rall.  They were also reading reports on their own and were supervising residents and over-reading residents' reports without supervision. The DOR billed Medicare for services provided by these physicians—in violation of their licensing requirements—and for radiological imaging reviewed by them.

42.     As set forth above, Medicare will only pay for a physician's services if she is properly licensed under State law.  To the extent that visiting professors were providing services, rather than teaching, and the DOR billed Medicare for these services, such billing constituted fraudulent claims, because the visiting professors' licenses did not allow them to actually provide radiology services.  Moreover, to the extent that physicians with temporary licenses were engaged in procedures and reviewing charts without proper supervision, and the DOR billed Medicare for their services as well, such conduct was fraudulent because the temporary license requires

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 14 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 14 of 21

supervision by the chief of staff, and the DOR's chief did not supervise the physicians with temporary licenses.

### E. Defendants Fraudulently Upcoded Mammography Procedures and/or Condoned Such Upcoding

43.     The Center for Medicare Services has issued national coverage determinations for mammograms.   A diagnostic mammogram is a "radiological procedure furnished to a man or woman with signs and symptoms of breast disease, or a personal history of breast cancer, or a personal history of biopsy-proven benign breast disease, and includes a physician's interpretation of the results of the procedure."  In contrast, a screening mammogram is a radiologic procedure furnished to a woman without signs or symptoms of breast disease, for the purpose of early detection of breast cancer and includes a physician's interpretation of the results of the procedure.  A screening mammogram has limitations as it must be, at a minimum a two-view exposure . . . of each breast."

44.     Medicare will not pay for a screening mammogram performed on a woman under the age of 35, and will pay for only one screening mammography procedure performed on a woman over the age of 34 but under the age of 40.

45.     Importantly, in order to bill for a diagnostic mammogram, direct supervision is required, meaning the physician must be present and immediately available to furnish assistance and direction throughout the performance of the procedure.  Direct supervision may also be accomplished via telemammography as long as the interpreting physician is immediately available.

46.     During his fellowship, Dr. Galuten became aware that many of the physicians who referred patients for mammography services would request a "diagnostic" mammogram when

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 15 of 21

what was required was a "screening" mammogram because they could get the results faster that way. The DOR, including Drs. Richards and Garg, condoned these practices and falsely billed Medicare and Medicaid for screening mammograms that were falsely upcoded as diagnostic mammograms.

47. In addition, it was common practice at the DOR to use and bill for computer-aided detection (CAD), without actually consulting it. In mammography, CAD can help a radiologist focus in on problem areas by highlighting micro calcification clusters and hyperdense structures in the soft tissue. This allows the radiologist to draw conclusions about the condition of the pathology. Medicare allows CAD procedures to be used with both plain and digital mammography, and reimburses for the use of CAD.

48. CAD was regularly performed at the DOR, but it was a normal and regular practice at the DOR for the mammographers not to review the actual CAD reports. Thus, although CAD was performed and billed, the radiologists at the DOR did not actually consult it.

**F. Defendants Fraudulently Billed for Teleradiology Services to Military Facilities**

49. The DOR also provided teleradiology services to several military bases—reading radiology images and providing reports through teleradiology. Because the images were notoriously difficult to read due to poor quality, these reviews would be routinely "dumped" into Dr. Rall's queue because it was well known in the Department that Dr. Rall did not actually really review images, but would sign off on charts without review.

50. The DOR therefore also fraudulently billed TRICARE by billing for radiology services in which the training physician actually did not review the image before signing off on the report.

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

## COUNT ONE

**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENT BILLING**
**(31 U.S.C. §3729(a)(1)(A) & (B))**

51.     Relator re-alleges and incorporates the allegations in paragraphs 1-50 as if fully set forth herein.

52.     Defendants knowingly made or caused to be made or used false statements, certifications and records in order to get false or fraudulent claims paid or approved by the Government.  Specifically, defendants certified on each and every report that a physician had read and reviewed the report, when in fact, physicians merely batched signed or signed off on reports without reviewing the images at all.  Defendants also made explicit and implicit certifications that reports were read and reviewed by properly licensed physicians, when they were not, or when they were read by such physicians without supervision.  Finally, by billing Medicare and/or Medicaid for the use of CAD, defendants impliedly and explicitly certified that CAD was actually being consulted by physicians in reading radiology reports, when it was not. These false statements, certifications, and records were used in order to get false or fraudulent claims paid or approved by the Government.  If Medicare and/or Medicaid and TRICARE had known that images and reports reviewed by residents had not been reviewed by teaching physicians, Medicare and/or Medicaid and TRICARE would not have paid for these radiology services.  Likewise, if Medicare and/or Medicaid and TRICARE knew that the reports and images had not been reviewed by a licensed physician, they would not have paid for these

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 17 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 17 of 21

services, And, if Medicare and/or Medicaid had known that CAD had not actually been consulted in reviewing images, they would not have paid for the use of CAD.

53.     Defendants also knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States.  Specifically, the claims described above were false or fraudulent because they were for radiology services that were supposed to have been provided by a teaching physician or a properly licensed physician, when they were not.  Moreover, as described above, many of the claims for diagnostic mammograms were actually for screening mammograms.  Defendants also knowingly presented, or caused to be presented, false or fraudulent claims for payment because they charged the government for radiology services that were substandard and inadequate.

54.     The United States of America, unaware of the falsity of the statements, certifications, and records and claims made thereupon, was damaged in an as of yet undetermined amount by Defendants' use of false and/or fraudulent statements and/or certifications in order to get claims paid or approved by the government and their presentment of false claims to the government.

55.     This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(A)(1)(a) & (b).

56.     The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 18 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 18 of 21

## COUNT TWO

**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENTLY RETAINING OVERPAYMENTS (31 U.S.C. §3729(a)(1)(G))**

57.      Relator re-alleges and incorporates the allegations in paragraphs 1-56 as if fully set forth herein.

58.      Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.  Specifically, defendants were aware that the program they were providing to residents was substandard and did not meet basic requirements for instructing residents.  Nevertheless, they concealed this information or provided false information to the Government and/or accreditation agencies in order to obtain and keep payments made by Medicare Part A for their residency program.

59.      Moreover, defendants were aware that they had been reimbursed for services that were not eligible for reimbursal by Medicare, but nevertheless fraudulently retained such overpayments.

60.      The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

## COUNT THREE

**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR CONSPIRACY (31 U.S.C. §3729)**

61.      Relator re-alleges and incorporates the allegations in paragraphs 1-59 as if fully set forth herein.

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 19 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 19 of 21

62.     Defendants conspired to commit a violations of 31 U.S.C. § 3729(a)(1) (A), (B), & (G);

63.     The United States, unaware of the conspiracy and the falsity of the claims, made payment upon the false and fraudulent claims and was therefore damaged.

## PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT

Relator respectfully requests this Court to enter judgment against defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(f)     That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT

Page 20 of 21

Case 2:11-cv-04140-FJG   Document 1   Filed 05/24/11   Page 20 of 21

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Dated: May 24, 2011                                  Respectfully submitted,


                                                     By:  /s/ Anthony L. DeWitt
                                                     _____

                                                     **BARTIMUS, FRICKLETON,**
                                                     **ROBERTSON & GORNY, PC**
                                                     Anthony L. DeWitt  MO#41612
                                                     715 Swifts Highway
                                                     Jefferson City, MO 65109
                                                     Tel. (573) 659-4454
                                                     Fax.  (573) 659-4460


                                                     **WATERS & KRAUS, LLP**
                                                     Charles S. Siegel
                                                     Loren Jacobson
                                                     3219 McKinney Ave.
                                                     Dallas, TX  75204
                                                     Tel. (214) 357-6244
                                                     Fax. (214) 871-2263

*U.S. ex rel. Galuten v. Univ. of Mo.-Columbia, et al.*
ORIGINAL COMPLAINT